**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHWESTERN DIVISION**

FILED

02 MAY 16 PM 1:3⁻

U.S. ᴅɪSᴛʀɪᴄᴛ ᴄᴏᴜʀᴛ
N.D. OF ALABAMA

| | | |
|---|---|---|
| JEFFERY REDCROSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-00-S-3216-NW |
| | ) | |
| CITY OF FLORENCE, ALABAMA; and, | ) | |
| CITY OF FLORENCE POLICE | ) | |
| DEPARTMENT, | ) | |
| | ) | |
| Defendants. | ) | |

ENTERED

MAY 1 6 2002

### MEMORANDUM OPINION

The City of Florence, Alabama, hired plaintiff, Jeffery Redcross, as a police officer in 1994.[1]

He continues to be so employed. His complaint in this action contains four counts, all based upon

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* The first count

alleges that the City and its police department denied him promotional opportunities because of his

race (African-American). The second count alleges that defendants subjected plaintiff to disparate

disciplinary sanctions on the basis of his race: *i.e.*, "[s]imilarly situated white employees are not

similarly disciplined for engaging in similar conduct."[2] The third count asserts that plaintiff was

denied a desirable job assignment because of his race. The final count alleges that, unlike white

police officers, plaintiff was not promoted to a Grade 9 pay scale immediately following his

completion of the requisite training and education hours.

---

[1]Doc. no. 30 (plaintiff's evidentiary submission in opposition to summary judgment), Exh. 46 (plaintiff's deposition), at 80.

[2]Complaint (doc. no. 1) ¶ 21.



The action now is before the court on defendants' motions for summary judgment and to strike portions of plaintiff's evidentiary submission. Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks and citations omitted); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Upon consideration of the pleadings, evidentiary submissions, and briefs, this court concludes that the motion to strike is due to be denied,[3] but the motion for summary judgment should be granted.

---

[3]This court has considered the exhibits challenged by defendants' motion to strike (doc. no. 34), to the extent such exhibits are relevant to the resolution of defendants' motion for summary judgment. Accordingly, this motion will be denied.

2

# I. SUMMARY OF FACTS

**A.**   **1997 Denial of Promotion to Grade 9 Level**

Plaintiff testified that he "attempted" to apply for promotion to a Grade 9 pay scale in 1997,[4]

because of his "belie[f]"[5] that he then met the qualifications for that pay grade.[6] Plaintiff spoke with

his shift supervisor, a "Captain Dodd," and "asked him about promotion to Grade 9."[7] Dodd advised

plaintiff "not to put in [his] paperwork," saying that "he didn't want me to appear that I'm trying

to move up the chain of command so early in my career."[8] Plaintiff accordingly "didn't file. I didn't

turn it [the paperwork] in."[9]

**B.**   **Denial of Alleged "Promotional Opportunities"**

During his tenure with the Florence police department, plaintiff requested, and was awarded,

assignments to the following positions:  Evidence Technician in 1995 or 1996; Intoxilyzer operator

in 1997; and Special Operations ("SWAT") Team in 1998 or 1999.[10]  He complains in this action

about being denied four other desired assignments in 1999, each of which is discussed below.

### 1.   Tobacco detail

Plaintiff received an e-mail on May 27, 1999, announcing two openings in a newly created

"tobacco detail" to be funded by a grant from the Alabama Department of Health.[11]  He applied for

---

[4]Doc. no. 30 (plaintiff's evidentiary submission), Exh. 46 (plaintiff's deposition), at 42-43. Note that in the brief submitted in opposition to summary judgment, plaintiff states that the event discussed in this section occurred in "either 1996 or 1997." Doc. no. 32, at 11.

[5]Doc. no. 30, Exh. 46 (plaintiff's deposition), at 42.

[6]*Id.*, Exh. 7.

[7]*Id.*, Exh. 46 (plaintiff's deposition), at 43.

[8]*Id.* Plaintiff then had been employed with the Florence police department less than three years.

[9]*Id.* at 44.

[10]*See* doc. no. 30 (plaintiff's evidentiary submission), Exh. 46 (plaintiff's deposition), at 130-37.

[11]Doc. no. 30, Exh. 8.

one of the positions, but was not selected.[12]  Plaintiff "does not know who was ultimately selected"

for either position.[13]  In any event, plaintiff contends that this assignment would have provided him

an opportunity to garner the experience necessary to advance to a Grade 9 pay level,[14] and would

have made him a more desirable candidate for other positions within the department.[15]  Such an

assignment would *not* have resulted in an increase in plaintiff's pay grade, grade step, or rank,

however; rather, it only would have afforded him an opportunity to earn an unknown amount of

overtime.[16]

> Q.      Do you have any idea how much overtime you would've gotten had you been
>         on the tobacco detail?
>
> A.      No idea.[17]

### 2.     Investigation Division

Plaintiff applied for assignment to the police department's investigation division during July

of 1999.[18]  Two white police officers, Eric Nichols and Dennis Patterson, were selected instead.[19]

Plaintiff asserts that he was more qualified than Nichols, because he had more education, greater

seniority, and more experience.[20]  Again, however, assignment to the investigation division would

*not* have resulted in an increase in plaintiff's pay grade, pay step, or rank[21] — only the opportunity

---

[12]Doc. no. 30, Exh. 46 at 11-12, 22, 141; *id.*, Exh. 1 ¶ 5.

[13]Plaintiff's brief in opposition to summary judgment (doc. no. 32), at 8.

[14]Doc. no. 30, Exh. 7; *id.*, Exh. 46 at 12, 141.

[15]Doc. no. 30, Exh. 46 at 12, 141.

[16]Doc. no. 30 (plaintiff's evidentiary submission), Exh. 46 (plaintiff's deposition) at 11-12, 126-27.

[17]*Id.* at 12.

[18]*Id.* at 23-24.

[19]*Id.* at 149.

[20]*Id.* at 165.

[21]*Id.* at 126-27.

4

to "garner the necessary experience to move towards the Grade 9 pay level,"[22] and, the possibility of "[a]n unknown amount of overtime and compensation time."[23]

### 3.      K-9 officer

Plaintiff asked to be assigned to a position on the police department's K-9 unit in September of 1999.[24]  Two white officers, Keith Robinson and Greg Cobb, were selected instead.[25]  Like the previous two positions, transfer to the K-9 unit would not have resulted in an increase in plaintiff's pay grade, pay step, or rank;[26] instead, it simply would have provided "experience required for advancement to the Grade 9 pay level,"[27] and, an opportunity to earn overtime pay and compensation time, which plaintiff "think[s]" amounted to "two hours each week."[28]

### 4.      Denial of Position on December 1999 DUI Task Force

As early as October of 1998, plaintiff expressed his interest in organizing a "DUI task force" within the Florence police department.[29]  The department implemented its first DUI task force in December of 1999, in anticipation of the millennium New Year's Eve celebration.  Despite plaintiff's previously stated interest, he was not selected for that *ad hoc* task force.  Instead, plaintiff was scheduled to work his regular shift (6:00 p.m. on December 31, 1999 through 6:00 a.m. on

---

[22]Plaintiff's brief in opposition to summary judgment (doc. no. 32), at 9.

[23]Doc. no. 30 (plaintiff's evidentiary submission), Exh. 46 (plaintiff's deposition) at 24.  It should be noted that plaintiff *was* selected for a position in the investigation division during March of 2001, and that he subsequently earned approximately three overtime hours of compensation a week, "[g]ive or take."  *Id.* at 25.

[24]*Id.* at 36-37.

[25]*Id.* at 158.

[26]*Id.* at 126, lines 9-19.

[27]Plaintiff's brief (doc. no. 32) at 8 (citing plaintiff's evidentiary submission (doc. no. 30), Exh. 7).

[28]Doc. no. 30 (plaintiff's evidentiary submission), Exh. 46 (plaintiff's deposition), at 37.

[29]Doc. no. 30 (plaintiff's evidentiary submission), Exh. 5 (Oct. 26, 1998 e-mail from plaintiff to Tony Logan, identified in the salutation as "Chief," and regarding plaintiff's "interest[] in getting a 'D.U.I.' task force started by our departmet [sic]").

5

January 1, 2000); off-duty, Day Shift police officers were brought in to work the DUI task force.

Once again, assignment to the task force would *not* have changed plaintiff's pay grade, pay step, or

rank; it only afforded an opportunity to earn overtime pay.[30]

## C.   Disciplinary Sanctions

Plaintiff was disciplined during November of 1999 for violating two departmental rules and

regulations. During that month, plaintiff was working the night shift, which began at 6:00 p.m. and

ended at 6:00 a.m. the following morning. Sometime after 5:00 a.m. on the morning of November

2, 1999, before the end of plaintiff's scheduled shift, a police department radio operator dispatched

a transmission to plaintiff, directing him to respond to an alarm call from a Florence residence.

Plaintiff answered the call at 5:22 a.m. — apparently using his "walkie talkie," rather than his car

radio[31] — and "acknowledged he would be enroute."[32]  One minute later, however, another police

officer (identified in the records provided to this court only as "Officer Robinson (355)") also

advised he was enroute to the same location. "At 0527 [5:27 a.m.] Officer Robinson advised Officer

Redcross he could 10-18 [code for "cancel the call"[33]].  At 0527 Officer Robinson arrived on the

scene and at 0530 cleared."[34]

---

[30]*Id.*, Exh. 46 (plaintiff's deposition) at 126-27. The department permanently created such a task force in June of 2000, and solicited applications from officers interested in "in working DUI enforcement for overtime." (Doc. no. 30 (plaintiff's evidentiary submission), Exh. 19 (June 27, 2000 memo). Plaintiff applied, but was not selected. Instead, five white officers, all of whom allegedly were less qualified than plaintiff, were assigned to the unit.  (*Id.*, Exh. 46 (plaintiff's deposition) at 232.)  For some reason that is not immediately apparent, neither plaintiff's complaint nor his brief in opposition to summary judgment addresses his non-selection in June of 2000. Rather, both allege only that defendant discriminated against him on the basis of race when not selecting him for the December 1999 DUI task force.

[31]*Id.*, Exh. 10 (Nov. 3, 1999 memo from Bobbie Smith to Lt. Larry Martin).

[32]*Id.*, Exh. 11 (Nov. 3, 1999 memo prepared by Lt. Larry Martin).

[33]*Id.*, Exh. 45 (translation of numeric code signals).

[34]*Id.*, Exh. 11 (Nov. 3, 1999 memo prepared by Lt. Larry Martin).

The foregoing exchange of radio chatter prompted Lieutenant Larry Martin, the Day Shift supervisor, to direct the dispatch operator to radio plaintiff, and instruct him to place a telephone call to the dispatch office. Plaintiff and Lt. Martin subsequently engaged in two telephone conversations. Both were recorded.

During the first conversation, Lt. Martin asked plaintiff for his location. Plaintiff replied that he was at his home (approximately five miles outside the city limits of Florence, Alabama), and was out of uniform. Martin asked plaintiff whether he had informed dispatch operators that he was leaving his patrol area and going out of service prior to the end of his shift. Plaintiff replied, "No. ... Me and Ivey has an understanding that if I come in at 5:30 [p.m.], he comes in at 5:00 [a.m.]."[35] Lt. Martin retorted, "Ivey's not on duty." Plaintiff then asked, "You want me to put my clothes on and come back?" That question generated the following exchange:

---

[35]*Id.*, Exh. 48 (transcription of recorded radio transmissions and telephone conversations), at 2. Plaintiff testified that it was a common practice for Florence police officers to go home prior to the end of their shifts:

Q.   That's not a violation for you to be home at 5:22 on a day you're supposed to be at work until 6:00 a.m.?

A.   No.

Q.   Why is that?

A.   I was able to respond to the call.

Q.   Is it okay for you to be working out of your house during the time you're on duty?

A.   Yes.

Q.   Why do you say that?

A.   Because we can do it. The nature of our job.

Q.   *Who has given you permission to do that?*

A.   It's — *it's common knowledge.*

*Id.*, Exh. 46 (plaintiff's deposition), at 207-08 (emphasis supplied).

Lt. Martin:     No, but I'll tell you what I do want okay?  What I do want right now
                is that, from now on, I want you to stay on duty you know, if you
                want a clear a 10-7 [code for "out of service"] or what ever, down the
                road, I have no problem with it, if it's cleared with your supervisors
                okay?

Plaintiff:      Okay.

Lt. Martin:     But from now on do me a favor.  You stay on and you do your job
                here and then you go on home ... I mean, just like everybody else.
                Please?

Plaintiff:      Okie-doke.[36]

Shortly after the foregoing conversation, plaintiff placed a second telephone call to Lt.

Martin, during which plaintiff asked that Martin "document our earlier conversation as I wanted .

. . a record, in case there were problems with the situation."[37]

Plaintiff insists that he was "neither rude nor disrespectful" in either conversation.[38]  Martin

formed a different impression: he later recorded that plaintiff's "attitude was like I'm challenging

you to even try doing anything to me."[39]  Consequently, when plaintiff reported for duty at the

beginning of his next shift, he was informed by Captain Shaddix that he "would be placed on

administrative leave with pay pending an investigation of the allegations ... lodged by Lt. Martin."[40]

Plaintiff subsequently was disciplined for two rule violations:  being unavailable for duty

service, and disrespect to a commanding officer.  Chief of Police Rick Singleton suspended plaintiff

without pay for three days, placed him on probation for six months, and revoked his take-home car

---

[36]*Id.* at 2-3.

[37]Doc. no. 30 (plaintiff's evidentiary submission), Exh. 1 (plaintiff's declaration) ¶ 5. Lt. Martin gave a different account, saying that in the second telephone conversation plaintiff said, "if I had a problem with this [*i.e.*, plaintiff being at home, out-of-uniform, prior to the end of his shift], he wanted it in writing so he [k]new how to file his grievance." *Id.*, Exh. 11 (Nov. 3, 1999 memo prepared by Lt. Larry Martin).

[38]*Id.*, Exh. 1 (plaintiff's declaration) ¶ 5.

[39]*Id.*, Exh. 11 (Nov. 3, 1999 memo prepared by Lt. Larry Martin).

[40]Doc. no. 30 (plaintiff's evidentiary submission), Exh. 1 (plaintiff's declaration) ¶ 6.

privileges.[41]  Plaintiff objected to the disciplinary sanctions, and requested a so-called "Due Process Hearing" to demonstrate that the allegations were without merit and the disciplinary sanctions were discriminatory.[42]  Plaintiff was granted a hearing, but the hearing officers did not recommend any change in the disciplinary sanctions.

Plaintiff appealed the disciplinary sanctions to the City of Florence Civil Service Board.  An appeal hearing was held on November 30, 1999.  The Board's December 8, 1999 decision was mixed.  On one hand, the Board did

> not concur that there [was] evidence of violations of rules 109-7-II or 110-2-VI-A-7. The testimony presented in writing and verbally . . . did not show evidence of 'insubordination or disrespect.'  While Officer Redcross' response to Lt. Martin may have seemed hasty, it is imperative that an employee's right to file a grievance is not perceived as an act of insubordination.  We therefore find that no disciplinary actions are warranted concerning these charges.  . . .[43]

On the other hand, the Board found that plaintiff, "under direct questioning," had admitted leaving his post prior to the end of his shift without the permission of a superior officer, a violation of Departmental Rule and Regulation 107-1-VII-C (pertaining to availability for duty).[44]

Thus, plaintiff "prevailed" on one of the two charges against him, which is reflected by the fact that the Board reduced plaintiff's monetary sanctions (suspension without pay) from 36 hours (three 12-hour shifts) to "one (1) hour for leaving his shift early."[45]  Even so, the Civil Service Board "[l]et it be known that [it did] not condone nor support any officer in not fulfilling his job

---

[41]*See* doc. no. 21 (defendants' evidentiary submission), Exh. A (Affidavit of Chief Singleton), ¶ 7.

[42]*See* doc. no. 30, Exh. 1 ¶ 10.

[43]Doc. no. 21 (defendants' evidentiary submission), Exh. F (Dec. 8, 1999 decision of Civil Service Board), at 1.

[44]*Id*. (The cited rule provides: "Members and employees of the Department, assigned to a specific detail, or post, will remain on duty until relieved by proper order or authority.")

[45]*Id*. at 2.

requirements, especially with regard to being available for duty," by increasing the other two

disciplinary sanctions imposed by the Chief of Police. The pertinent part of the Board's decision

reads as follows:

> Let it be known that this civil service board does not condone nor support any officer
> in not fulfilling his job requirements, especially with regard to being available for
> duty. It is our opinion that being available for work is a primary requirement for
> employment. We further believe that the employee is obligated to adhere to
> established and specified work shifts, and does not have the authority to alter his
> work schedule without prior management approval.
>
> This board, in good conscience, cannot overlook this offense as a minor infraction.
> Therefore, we do find that some disciplinary action is warranted.
>
> Chief Singleton, while this board cannot condone the actions of Officer Redcross, the
> testimony presented in this hearing[] indicated that there are some management
> issues in this area[] that need to be addressed.
>
> Officer Redcross stated that dispatch does not assign calls to the shift going off-duty
> for the last half-hour or so. These calls, instead, are given to the shift coming on-
> duty, and the shift going off-duty usually prepares to go home during this time.
>
> This practice, as clarified by Lt. Larry Martin, is a practice implemented to eliminate
> excessive overtime. Lt. Martin made it clear, however, that this procedure does not
> give any officer approval to leave his assigned patrolling area or work detail before
> the end of his assigned shift.
>
> Officer Paul Ivey stated that officers have previously made arrangements between
> themselves to cover calls for each other during the overlapping time-period between
> shifts. Indications are that other officers may be leaving their shifts early. Chief
> Singleton, we respectfully suggest that you look into this matter to implement a
> procedure of checks and balances that will insure that **everyone** is held accountable
> for working their assigned shifts, and that no officer is allowed to leave their posts
> early.
>
> With the above considered, we recommend that Officer Redcross be disciplined as
> follows:
>
> ● The work shift of November 2, 1999 is to be corrected and reduced by one
>   (1) hour for leaving his shift early. This hour will be deducted from a
>   subsequent pay period.

- Take home car privileges are revoked indefinitely and may be reinstated upon recommendation of his superior officer and approval of the Chief of Police.

- That Officer Redcross will be placed on probation for a period of twelve (12) months, effective November 8, 1999 through November 4, 2000.  Said probation will be revised quarterly (every three (3) months) and may be suspended after six (6) months of satisfactory work performance, and recommendation by a superior officer and approval by the Chief of Police.[46]

The sanctions recommended by the Board were implemented by the Florence police department.  Plaintiff's work performance was not reevaluated at quarterly intervals, however, and he thus remained on probation for the full one-year period.  Even so, plaintiff suffered no tangible sanction.  Indeed, as the City of Florence points out, plaintiff applied for promotion to the Grade 9 pay scale on December 5, 1999, and his application was granted by the Chief of Police and Civil Service Board, effective December 26, 1999.[47]

### III. DISCUSSION

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on February 29, 2000, alleging that "the City of Florence and the Florence Police Department have discriminated against me on the basis of my race, African-American, in duty assignments, promotions, discipline, and other terms conditions, and privileges of my employment in violation of Title VII . . . ."  After receipt of a notice of his right to sue, plaintiff filed this suit in a timely manner, naming both the City and its police department as defendants.

### A.    Claims Against Police Department

Defendants contend that the police department is not a proper party to this action, as it does not qualify as an "employer" for purposes of Title VII.  Further, "the City of Florence is liable for

---

[46]*Id.* at 1-2 (emphasis in original).

[47]*See* doc. no. 22 (defendants' brief in support of summary judgment), at 30-31.

any discrimination of its employees regardless of which department [of city government] they work in."[48]   This court agrees, but adds a gloss to that argument.  The Federal Rules of Civil Procedure instruct district courts that a party's "capacity to sue or be sued shall be determined by the law of the state in which the district court is held."  Fed. R. Civ. P. 17(b).  This court has not found a decision by the Supreme Court of Alabama specifically addressing the capacity of municipal police departments to be sued under the law of that State, but that same Court has held that an Alabama county sheriff's department lacks such capacity.  *White v. Birch*, 582 So. 2d 1085, 1087 (Ala. 1991); *see also King v. Colbert County*, 620 So. 2d 623, 626 (Ala. 1993).  Federal courts have agreed.  *See Russell v. Mobile County Sheriff*, No. Civ. A. 00-0410CBC, 2000 WL 1848470, at *2 (S.D. Ala. Nov. 20, 2000) ("[A]n Alabama sheriff's department is not a legal entity that is subject to being sued.").  Moreover, the Eleventh Circuit has stated, albeit in dicta, and in the context of a § 1983 claim against the Jefferson County, Alabama Sheriff's Department, that "sheriff's departments *and police departments* are not usually considered legal entities subject to suit."  *Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992) (emphasis supplied) (citations omitted).  Other courts within and outside the Eleventh Circuit also have concluded that municipal police departments lack the capacity to be sued.  *See, e.g., Mann v. Hillsborough County Sheriff's Office*, 946 F. Supp. 962, 970 (M.D. Fla. 1996) (citing *Dean*, among other cases, for the proposition that police departments are not generally subject to suit); *Pierre v. Schlemmer*, 932 F. Supp. 278, 280 (M.D. Fla. 1996) (acknowledging Eleventh Circuit precedent holding that police departments usually are not subject to suit under § 1983); *Shelby v. City of Atlanta*, 578 F. Supp. 1368, 1370 (N.D. Ga. 1984)

---

[48]Defendant's brief in support of summary judgment (doc. no. no. 22), at 11.  Title VII of the Civil Rights Act of 1964 defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year...." 42 U.S.C. § 2000e(b); *see also id.* § 2000e(f) (defining the term "employee" as "an individual employed by an employer").

(concluding that the Atlanta Police Department is not a proper party defendant because it is "merely the vehicle through which the City government fulfills its policing functions"); *Norwood v. City of Hammond*, No. Civ. A. 99-879, 1999 WL 777713, at *3 (E.D. La. Sept. 30, 1999) (observing that federal courts consistently dismiss § 1983 claims against police departments because they are not entities subject to suit).

For all of the foregoing reasons, therefore, defendants' motion for summary judgment will be granted on all claims asserted against "the City of Florence Police Department."

## B.    Promotion Claim

Plaintiff's claim that he was not promoted to a Grade 9 pay level as quickly as similarly situated white police officers is time-barred.

A plaintiff must satisfy a number of administrative prerequisites before filing a suit based upon Title VII.  Foremost among these is the requirement that a charge of discrimination be submitted to the Equal Employment Opportunity Commission within 180 days "after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); *see also, e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000) ("No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge.").  The events about which plaintiff complains in this count of his complaint — *i.e.*, Captain Dodd's discouragement of plaintiff's application for promotion to a Grade 9 pay scale "so early in [his] career" — all occurred in 1997, but plaintiff did not file his EEOC charge until February 29, 2000 — *far* more than 180 days after the allegedly discriminatory employment action.

Further, plaintiff has not argued, and this court discerns no principled basis upon which it could be contended, that the 1997 event constitutes a "continuing violation."  One exception to the

13

180-day filing requirement is the so-called "continuing violation doctrine." It is something of a misnomer to call this area of law a "doctrine," however. Rather, as the Fifth Circuit aptly observed, it is a "theory, the precise contours and theoretical bases of which are at best unclear...." *Berry v. Board of Supervisors*, 715 F.2d 971, 979 (5th Cir. 1983). Two noted commentators on federal employment discrimination law also have said that "[t]he cases discussing 'continuing violations' are impossible to reconcile." II Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 1351 (3d ed. 1996). For such reasons, the concept of "continuing violations" is perhaps best viewed *not* as a monolithic construction, but as a theorem encompassing at least three categories of factual circumstances: *e.g.*, (1) cases addressing a series of discrete, allegedly discriminatory acts, with at least one act falling within the charge-filing period; (2) cases focusing upon an employer's maintenance of an allegedly discriminatory system or policy; or (3) cases directed to the so-called "present effects of past discrimination." *See generally id.* at 1353-60. Plaintiff's claim fits within the third category. Even so, the Supreme Court foreclosed similar claims, based solely upon the residual effects of discriminatory conduct that is not made the subject of a timely filed EEOC charge, in *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

> A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.

*Id.* at 558, 97 S.Ct. at 1889.

## C.   Transfer and Discipline Claims

Plaintiff claims that, "[d]espite his qualifications and performance within the [Florence police] department, he was consistently denied promotional and/or advancement opportunities by

14

his superiors because of his race ...."[49]  Defendants respond that "the jobs Plaintiff claims he was

denied are not even promotions[,] ... which the denial of is clearly not an adverse employment

action."[50]

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.

§ 2000e–2(a)(1).[51]  In order to prove that an employer violated this statute, a plaintiff must

demonstrate: (1) that his employer possessed a discriminatory animus toward him because of a

protected characteristic, (2) a serious and material alteration in the terms, conditions, or privileges

of his employment, and (3) a causal linkage between the two.  *See Llampallas v. Mini-Circuits, Lab,*

*Inc.*, 163 F.3d 1236, 1245-46 (11th Cir. 1998); *see also, e.g., Stimpson v. City of Tuscaloosa*, 186

F.3d 1328, 1331 (11th Cir. 1999) (same).

> To succeed in proving intentional discrimination under [§ 2000e–2(a)(1)], ...
> a plaintiff must establish by a preponderance of the evidence: (1) a discriminatory
> animus towards him (i.e., an attitude towards the plaintiff held because of one of the
> listed characteristics), *see International Bhd. of Teamsters v. United States*, 431 U.S.
> 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977) (stating that in
> disparate treatment cases, "[p]roof of discriminatory motive is critical, although it can
> in some situations be inferred from the mere fact of differences in treatment"), (2) an
> alteration in the terms and conditions of his employment by the employer, and (3) a
> causal link between the two. *Cf. Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460
> (11th Cir. 1998) (establishing the elements for a prima facie case under § 2000e-3(a)
> (1994), which prohibits adverse employment action because of the plaintiff's conduct

---

[49] Plaintiff's Memorandum (doc. no. 32), at 8.

[50] Defendants' Memorandum of Law (doc. no. 22), at 11.

[51] 42 U.S.C. § 2000e-2(a)(1) states:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to
> discharge any individual, or otherwise to discriminate against any individual with respect to his
> compensation, terms, conditions, or privileges of employment, because of such individual's race,
> color, religion, sex, or national origin....

15

instead of adverse employment action because of the plaintiff's [protected] characteristics).  . . .

*Llampallas*, 163 F.3d at 1245-46 (footnote omitted).[52]

The three components of a Title VII disparate treatment case sketched by the *Llampallas* Court should not be confused with the *McDonnell Douglas* analytical framework.  Rather, the three-step *McDonnell Douglas* test — and particularly the first, "prima facie case" step — essentially addresses only the first component of the *Llampallas* formulation:  proof that the employer *intended* to discriminate against plaintiff on the basis of criteria prohibited by Congress; which, of course, is the ultimate question in every employment discrimination case.[53]  In the absence of direct evidence of a discriminatory animus,[54] the employer's intention or motivation for the challenged employment action generally is established indirectly, using the now familiar analytical framework that the Supreme Court announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct 1817, 36

---

[52] In the omitted footnote, the *Llampallas* Court observed that its opinion addressed only "disparate treatment" claims, as opposed to "disparate impact" claims.  163 F.3d at 1245 n.16.

[53] The "ultimate question" in every employment discrimination case is *not* whether a contested employment action was good or bad, fair or unfair, or whether the plaintiff has established a prima facie case, or demonstrated pretext, but instead is whether "'the defendant intentionally discriminated against the plaintiff.'"  *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481-82, 75 L.Ed.2d 403 (1983) (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)).  The Eleventh Circuit reiterated this truism in *Damon v. Fleming Supermarkets of Florida, Inc.* 196 F.3d 1354 (11th Cir. 1999), saying:

> We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law.  *See Elrod v. Sears, Roebusk & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).  We are not in the business of adjudging whether employment decisions are prudent or fair.  Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.  *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984).

*Damon*, 196 F.3d at 1361.

[54] *See, e.g., Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989).  Only the most blatant remarks indicating a discriminatory animus constitute direct evidence.  *See, e.g., Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999); *Wright v. Southland Corporation*, 187 F.3d 1287, 1293-1303 (11th Cir. 1999).  Further, "[t]o amount to direct evidence, a statement must:  (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal a blatant discriminatory animus."  *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).

L.Ed.2d 668 (1973), and then elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141-42, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000) (Rule 50 motion for judgment as a matter of law). As Justice O'Connor observed in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), "the entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by." *Id.* at 271, 109 S.Ct. at 1801-02 (O'Connor, J., concurring).

But, it is not the intent prong of the *Llampallas* formulation that merits discussion here; rather, it is upon the last two components that plaintiff's remaining claims falter. Plaintiff has not established that the City's failure to transfer him to any of the contested positions amounted to an "adverse employment action," or that there is a causal connection between the City and his disciplinary sanctions.

### 1. Denial of plaintiff's transfer requests and the requirement of an "adverse employment action"

For plaintiff's Title VII action to succeed, he must establish that the remaining complained-of conduct by defendants — namely, repeated denial of his transfer requests — rose to the level of an adverse employment action. This is because, for a plaintiff to establish a prima facie case of race-based discrimination under Title VII, based either on an undesired transfer or denial of a transfer request, a plaintiff must show four things: (1) that he is a member of a protected class; (2) that he was qualified for the position he held or desired; (3) *that he suffered an adverse employment action*; and (4) that he either was replaced in his former position, or the desired position was filled, by

17

someone outside his protected class. *See Hinson v. Clinch County*, 231 F.3d 821, 828 (11th Cir. 2000) (Title VII and § 1983 sex discrimination claims for transfer of female principal to a teaching position); *Smith v. Alabama Department of Corrections*, 145 F. Supp. 2d 1291, 1297 (M.D. Ala. 2001) (Title VII, ADA, § 1981, and § 1983 race and disability discrimination claims for employer's denial of plaintiff's requested transfer). The third element usually is the one requiring close scrutiny, because denials of transfer requests and undesired transfers only *"sometimes* constitute an adverse employment action." *Doe v. Dekalb County School District*, 145 F.3d 1441, 1448 (11th Cir. 1998) (emphasis supplied) (citing *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077, 1078 (11th Cir. 1996) (holding that a transfer *may be* an adverse action under the ADA)).

Indeed, not all employee relocations are alike: transfers may, or may not, produce serious and material alterations in the terms, conditions, or privileges of an affected person's employment. *See Doe*, 145 F.3d at 1452.[55] Further, a transfer

> may take on the aspect of either promotion or demotion, depending on whether it is or is not desired by the affected worker. That is, discrimination can be found either in an employer's refusal to grant a desired transfer or in the involuntary transfer of an employee to an undesired position.

1 Lex K. Larson, *Employment Discrimination* § 12.08 (2d ed. 2000) (footnotes omitted).

This court is aware of the "factual difference" between cases in which "a plaintiff is literally transferred against his will," and those in which the plaintiff "was denied a transfer for which he applied." *Smith*, 145 F. Supp. 2d at 1299. This court agrees with the *Smith* Court, however, and

---

[55]The *Doe* Court indicated that transfers resulting in "lesser pay, responsibilities, or prestige," involving "arduous travel," or impeding "an employee's professional growth or advancement" should be deemed "adverse." *Doe v. Dekalb County School District*, 145 F.3d 1441, 1452 (11th Cir. 1988) (citing *Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1519 (11th Cir. 1990) (lesser pay); *Collins v. State of Illinois*, 830 F.2d 692, 704 (7th Cir. 1987) (lesser responsibilities); *de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Serv.*, 82 F.3d 16, 21 (3d Cir. 1994) (transfer resulting in lessened prestige and professional growth); *Maddow v. Proctor & Gamble Co.*, 107 F.3d 846, 852 (11th Cir. 1997) (travel); *Torre v. Casio, Inc.*, 42 F.3d 825, 831 n.7 (3d Cir. 1994) (impeded advancement through transfer to a dead-end job)).

concludes that forcing the definition of an "adverse employment action" to turn on "such a difference would unnecessarily complicate employment discrimination law." *Id.* (citing *Doe*, 145 F.3d at 1451 (applying Title VII precedents in an ADA case, and expressly stating that the court did not want to create a difference in the analysis of ADA claims that would introduce unnecessary inconsistency and confusion into employment discrimination law)). As the *Smith* Court explained:

> [T]he factual difference between the claims in [cases such as *Doe v. Dekalb County School District*, in which the plaintiff was involuntarily transferred to an undesired position, and cases such as the one at issue in *Smith*, where the plaintiff was denied a desired transfer] does not require a different result as the Eleventh Circuit has stated that merely because a transfer is *involuntary* does not necessarily mean that it is *adverse*. [*Doe*, 145 F.3d] at 1454.[56] While it logically may make sense to say that a denial of a transfer is an "adverse" action because it is not what the employee wished, such an action is no more "adverse," logically speaking, than a purely lateral transfer made against an employee's will, which the Eleventh Circuit has stated in [*Doe v.*] *Dekalb County* does not necessarily rise to the level of an adverse employment action.
>
> In light of Eleventh Circuit precedent, this court must conclude that [regardless of] whether the transfer was requested, or was required against the employee's will, *the position to which the employee was transferred, or denied a transfer, must entail a serious and material change in the terms, conditions, or privileges of employment in order for a plaintiff to state a prima facie case of*

---

[56]The *Doe* Court indicated that the involuntary nature of a transfer is not necessarily dispositive of the issue of adversity, which ultimately is measured by an objective standard.

> In determining whether Doe's transfer was adverse, the district court should not rely on its determination that the transfer was involuntary. In saying this, we do not mean to disturb the district court's finding on this issue but rather to make clear that the voluntary or involuntary nature of the transfer is not relevant to the question of whether it was unlawfully adverse. Of course, a finding that Doe's transfer was purely voluntary would have been dispositive in the School District's favor; a transfer cannot be "because of a disability" if it occurred as the result of an employee's own request. *Cf. Stewart v. Board of Trustees of the Kemper County Sch. Dist.*, 585 F.2d 1285, 1289 (5th Cir. 1978) (voluntary transfer not unlawful under Title VII); *Hooper v. Maryland*, No. 94-1067, 1995 WL 8043 (4th Cir. 1995); *Devine v. Thalhimers*, No. 92-1084, 1992 WL 296350 (4th Cir. 1992). The fact that Doe's transfer was involuntary, however, does not in any way establish that it was legally adverse. *Cf. Williams* [*v. Bristol-Myers Squibb Co.*], 85 F.3d [270,] 274 [(7th Cir. 1996)] (finding an "involuntary" transfer to be non-adverse). If a reasonable person in Doe's position would have viewed the transfer as non-adverse, the district court should not consider Doe's subjective, personal preference for his prior position.

*Doe*, 145 F.3d at 1454.

*intentional discrimination*. This court's conclusion is bolstered by decisions from other courts in analogous cases. For instance, analyzing a failure to transfer to a position sought by the employee under the traditional adverse employment action analysis is consistent with the approach taken by another judge in this district in the previously-discussed *Rowlin* case. *See Rowlin*, 2001 WL 630581 at *8 (analyzing transfer for which an employee applied under traditional adverse employment analysis). In addition, one court of appeals has adopted the approach of applying the same standards to both types of transfers. *See Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999) (agreeing with the argument that the same legal standards govern a claim for involuntary transfer and for a denial of a requested transfer); *but see Parker v. State of Delaware Dept. of Public Safety*, 11 F. Supp. 2d 467, 477 & n. 9 (D. Del. 1998) (stating that a denial of a request for a lateral transfer is adverse because it is a denial).

*Smith*, 145 F. Supp. at 1299 (emphasis added).

Thus, in Title VII cases involving either transfers to undesirable positions or, as here, the denial of requests for transfer or reassignment to desired positions, plaintiffs "must show that they have suffered an adverse personnel action in order to establish a prima facie case under the *McDonnell Douglas* framework." *Brown v. Brody*, 199 F.3d 446, 455 (D.C. Cir. 1999).

An employment action is considered sufficiently "adverse" to be actionable under federal discrimination statutes "only if it results in some *tangible, negative effect* on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001) (emphasis supplied) (ADA retaliation claim); *see also, e.g., Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (holding, in context of Title VII retaliation claim, that "[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee'") (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)). *Cf. Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633

20

(1998) (holding, in context of Title VII sexual harassment claim, that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

The "classic and ultimate 'tangible employment action,'" of course, is termination of a person's employment. *Llampallas*, 163 F.3d at 1246 n.18. Other "patently adverse" employment actions include: "demotion, reduction in pay, loss of prestige, or diminishment of responsibilities," *Doe*, 145 F.3d at 1448; and those constituting "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)  Actions falling short of those benchmarks sometimes are difficult to characterize. Even so, some guiding principles are fairly clear.

The fundamental principle is that Title VII is not a "general civility code"; accordingly, it does not protect employees from "the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283-84, 141 L.Ed.2d 662 (1998).[57]  It follows, therefore, that an employment action does not become actionably adverse "merely because the employee dislikes it or disagrees with it." *Doe*, 145 F.3d at 1449 (quoting *Perryman v. West*, 949 F. Supp. 815, 819 (M.D. Ala. 1996)); *accord McCoy v. Macon Water Authority*, 966 F. Supp. 1209,

---

[57]*See also, e.g., Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) (holding that "the ADA, like Title VII, is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'") (citing *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1265 (10th Cir. 1998)). *Cf. McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994) (observing in the context of an action founded on 42 U.S.C. § 1983 that the phrase "'adverse employment action' is broadly defined and as a matter of law includes not only discharges, but also demotions, refusals to hire, refusals to promote, and reprimands").

1220 (M.D. Ga. 1997). Neither "every unkind act,"[58] nor "everything that makes an employee unhappy,"[59] amounts to an adverse employment action. "Otherwise, every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996).

Ultimately, therefore, a plaintiff within the Eleventh Circuit must show a *serious and material* change in the terms, conditions, or privileges of his employment, and the plaintiff's subjective view of the significance of his employer's action is not controlling. As the appellate court has written, "[a]ny adversity must be material; it is not enough that a transfer [or any other contested employment action] imposes some *de minimis* inconvenience or alteration of [the terms, conditions, privileges, or] responsibilities [of the plaintiff's job position]." *Doe*, 145 F.3d at 1453 (citation and footnote omitted);[60] *see also Davis v. Town of Lake Park*, 245 F.3d at 1239 ("Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the

---

[58]*Doe v. Dekalb County School District*, 145 F.3d 1441, 1449 (11th Cir. 1998) (quoting *Wu v. Thomas*, 996 F.2d 271, 273 n.3 (11th Cir. 1993) (*per curiam*)).

[59]*Doe*, 145 F.3d at 1450 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)); *see also Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) ("not everything that makes an employee unhappy is an actionable adverse action.").

[60]In the omitted footnote, the *Doe* Court observed that:

It is important not to make a federal case out of a transfer that is *de minimis*, causing no objective harm and reflecting a mere chip-on-the-shoulder complaint. However, it is equally important that the threshold for what constitutes an adverse employment action not be elevated artificially, because an employer's action, to the extent that it is deemed not to rise to the level of an adverse employment action, is removed completely from any scrutiny for discrimination. In other words, where the cause or motivation for the employer's action was clearly its employee's disability, a finding that the action does not rise to the level of an adverse employment action means that the action is not scrutinized for discrimination. An artificially high threshold for what constitutes an adverse employment action would undermine the purposes of the statute by permitting discriminatory actions to escape scrutiny. We believe that the purposes of the statute are appropriately served by requiring the fact finder to determine whether a reasonable person would consider the action adverse under all the facts and circumstances.

*Doe*, 145 F.3d at 1453 n. 21.

employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job *in a real and demonstrable way*.") (emphasis supplied). Instead, a plaintiff must demonstrate that a reasonable person in the plaintiff's same position would have viewed the contested employment action as materially adverse under the circumstances before it may be said to rise to the level of an actionable, adverse employment action. *See, e.g., Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001); *Doe*, 145 F.3d at 1449.

Employment decisions that are not "patently adverse" still may satisfy Title VII's adversity requirement. To do so, however, the contested action "must meet 'some threshold level of substantiality . . . to be cognizable'" under Title VII. *Gupta*, 212 F.3d at 587 (quoting *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998)); *see also Smith v. Alabama Department of Public Safety*, 64 F. Supp. 2d 1215, 1221-22 (M.D. Ala. 1999) (finding that Title VII plaintiff could not establish adverse employment action, because he suffered no loss in pay, benefits, or classification, only great embarrassment).

With these guiding principles in mind, the court proceeds to consider whether the denials of plaintiff's transfer requests amount to an adverse employment action under Title VII.

### a. The "adverse" consequences of denying plaintiff's requested assignments

During his deposition, plaintiff identified only two adverse consequences flowing from the denial of his requests for assignment to the tobacco detail, investigation division, K-9 unit, or December 1999 DUI task force: the loss of "speciality points" that would enhance his opportunity for promotional advancement to a Grade 9 pay scale; and, the loss of opportunities to earn overtime compensation. Each is discussed, in turn, below.

23

i.    The loss of "speciality points"

Plaintiff's contention that denial of his requests for assignment to the positions described above is grounded in Exhibit No. 7 of his evidentiary submission: a copy of the job description for "Police Officer Grade 9." The knowledge, skills, and abilities required for that position include the following:

> Specialized Assignments: Must score at least 6.0 points in this category. Each of the following specialized assignments will earn required points toward Grade 9. With the exception of Crime Prevention and Drug Education, time spent in these positions while in a probationary status does not apply toward meeting these requirements:

| Assignment | Tenure | Points |
|---|---|---|
| Evidence Technician | 6 months | 2 |
| Photographer | 6 months | 2 |
| Motor Officer | 6 months | 2 |
| Special Operations | 6 months | 2 |
| Crime Prevention | 9 months | 2 |
| Drug Education | 9 months | 2 |
| General Investigation | 9 months | 2 |
| Intoxilyzer Operator | Certified | 1 |
| Firearms Instructor | Certified | 2 |
| Identi-Kit Specialist | Certified | 1 |
| K-9 Officer | 9 months | 2 |
| Radar | Certified | 1[61] |

Plaintiff requested and was awarded assignments to Evidence Technician in 1995 or 1996 (2 points), Intoxilyzer Operator in 1997 (1 point), and the Special Operations ("SWAT") Team in

---

[61]Doc. no. 30 (plaintiff's evidentiary submission), Exh. 7, at 3.

1998 or 1999 (2 points).[62]  Thus, he lacked only one point for the required "6.0 points in this category" to satisfy the requirements for advancement to "Police Officer Grade 9."

The job description presented to this court by plaintiff is not dated, however.  That fact is troubling, because the City presented evidence that its police department

> changed its promotional policies in 1997.  (Singleton Aff. at p. 2.)  Under the old system, an employee would not be promoted to a Grade 9 position without earning a certain number of "speciality points."  (*Id.*)  These "speciality points" were earned by an officer by working in certain departments or on specific assignments.  (*Id.*)  In 1997, the "speciality points" promotional system was discontinued by the Civil Service Board.  (*Id.*)  The new promotional track system instituted by the Civil Service Board relied upon an officer's education, training and experience.  (*Id.*)  *Under the new system, "speciality points" were no longer considered and not necessary for an officer to be promoted.*  (*Id.*)[63]

Plaintiff did not offer evidence or argument in opposition to the foregoing assertions.  Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g., Chapman*, 229 F.3d at 1027 ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards.").  *Cf., e.g., Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 n.1 (11th Cir. 2001) ("Lucas has abandoned his unlawful harassment claim by not raising it in his initial brief on appeal.") (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1317 n.17 (11th Cir. 1999) ("Issues that are not clearly outlined in an appellant's initial brief are deemed abandoned.") (citations omitted)); *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.") (quotation marks and citation omitted); *Marek v. Singletary*, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised

---

[62] *See supra* text at Part I.B.

[63] Doc. no. 22 (defendants' brief in support of summary judgment), at 13-14 (emphasis supplied).

in the briefs are considered abandoned."); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573

n.6 (11th Cir. 1989).

In any event, the denials of plaintiff's 1999 transfer requests cannot be considered adverse

employment actions, because the decisions had no effect on his promotion to Grade 9. As the City

correctly observes:

> Plaintiff applied for an actual promotion to a Grade 9 officer position on December 5, 1999, a few months after he claimed he was adversely impacted by the denial of the job assignments. (Plaintiff's Depo. at p. 145, lns. 7-9; p. 146, lns. 9-15.) *Even without the "speciality points"* Plaintiff claims he had to have for a promotional opportunity, *Plaintiff was promoted to Grade 9 effective December 26, 1999.* (*Id.* at p. 262, lns. 3-4.) Plaintiff's subjective belief that he needed the job assignments to be promoted is clearly misplaced due to the fact that he did not get the speciality points he thought he needed to be promoted, and yet was promoted the first time he applied for a true job promotion. Clearly, the denial of job assignments cannot be considered "adverse actions" subject to Title VII review because these denials had absolutely no effect on Plaintiff.[64]

### ii.   Loss of opportunities to earn overtime compensation

Thus, plaintiff's claims related to his requests for transfer to the tobacco detail, investigation

division, K-9 unit, or 1999 DUI Task Force come down to the question of whether loss of

opportunities to earn overtime compensation amounts to an adverse employment action. The

rationale of the District of Columbia Circuit in *Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999), is

instructive on this issue.

In *Brown*, the plaintiff's employer initially transferred her to a position she did not desire,

and later declined to assign her to a newly created position she did desire. The rank, salary, and

benefits "were the same in Brown's original job, in the job to which she was sent, and in the job she

---

[64]*Id.* at 14 (emphasis supplied).

was denied." *Id.* at 455.  As a consequence, there was "no objective basis for finding that she was

harmed by these decisions in any tangible way." *Id.* at 457.

> "The clear trend of authority," as we mentioned in *Mungin* [*v. Katten Muchin & Zavis*], 116 F.3d [1549,] 1556-57 [(D.C. Cir. 1997)], "is to hold that a 'purely lateral transfer, *that is, a transfer that does not involve a demotion in form or substance,* cannot rise to the level of a materially adverse employment action.'" *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997) (quoting *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)).

*Brown*, 199 F.3d at 455-56 (emphasis added).  The *Brown* Court engaged in a survey of case law

discussing the concept of adverse employment actions, and concluded that "the authority requiring

a clear showing of adversity in employee transfer decisions is both wide and deep." *Id.* at 456

(collecting cases).  On the basis of that finding, the *Brown* Court

> announce[d] the following rule:  a plaintiff who is made to undertake or who is *denied a lateral transfer* — that is, *one in which she suffers no diminution in pay or benefits* — *does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities* such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm.  Mere idiosyncracies of personal preference are not sufficient to state an injury.  *See, e.g., DiIenno v. Goodwill Indus.*, 162 F.3d 235, 236 (3d Cir. 1998); *Doe*, 145 F.3d at 1448 (finding "no case, in [the 11th] or any other circuit, in which a court explicitly relied on the subjective preferences of a plaintiff to hold that plaintiff had suffered an adverse employment action"); *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996) (emphasizing that "not everything that makes an employee unhappy is an actionable adverse action").

*Brown*, 199 F.3d at 457 (emphasis added).

The *Brown* rationale fits this case for two reasons.  If plaintiff had been granted reassignment

to any of the positions he coveted, the action would not have increased his pay grade, pay step, or

rank.  Of equal, if not greater, importance is the fact that denial of his requests for transfer did not

diminish his pay, benefits, or rank.  Of course, plaintiff asserts that he lost opportunities to earn

*additional* compensation in the form of overtime (although his deposition testimony is less than precise on just how much). As best this court has been able to ascertain, only a handful of federal courts have considered a similar argument, but all have rejected it.

For example, in *Bupp v. Henderson*, No. Civ.A. 299CV553, 2000 WL 33128529 (E.D. Va. April 12, 2000), a white male plaintiff alleged that the United States Postal Service denied his request for transfer from a "mail processor" position to a "mail handler" slot because of his race, sex, and prior EEO complaints. The job to which the plaintiff desired to be transferred carried the same base pay and benefits as the position he held, but it allegedly would have allowed him "to work considerable overtime hours." *Id.* at *5. The Eastern District of Virginia held that the plaintiff's loss of potential overtime was not sufficient to establish that the denial of the requested transfer amounted to an actionable injury under Title VII. The district court's reasoning is persuasive:

> In order to maintain an action for discrimination or retaliation under Title VII, Plaintiff must show that he suffered some type of "tangible employment action" at the hands of his employer. *See, e.g., Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999). Plaintiff must therefore show that the terms, conditions, or benefits of his employment were adversely affected. *See Munday v. Waste Management of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997). In addition to discharge, demotion, and failure to promote, such adverse employment actions may include a significant change in benefits or reassignment with significantly different responsibilities. *See Boone*, 178 F.3d at 256-57.
>
> Plaintiff's claims here are based on Defendant's denial of his request for a lateral transfer. He has submitted evidence indicating that he would be able to work considerable overtime hours if he were transferred to a mail handler position. However, he has consistently characterized the requested transfer as a lateral move, *and he has submitted no evidence indicating that the terms of his employment as a mail processor* [the position held by plaintiff on the date his request for transfer was denied] *have been adversely affected in any way.* As the Magistrate Judge found, a transfer — *or denial of a transfer* — *without a decrease in pay, benefits, or responsibilities, does not constitute an adverse employment action for Title VII purposes. See, e.g., Boone*, 178 F.3d at 257 ("reassignment to a new position commensurate with one's salary level does not constitute an adverse employment

28

action"); *Brown v. Brody*, 199 F.3d 444, 457 (D.C. Cir. 1999) ("a plaintiff ... who is denied a lateral transfer ... does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of employment").

*Bupp*, 2000 WL 33128529, at *5 (emphasis added).

Similarly, the Middle District of Florida held in *MacLean v. City of St. Petersburg*, No. 8:00CV613T17EAJ, 2002 WL 480903 (M.D. Fla. Mar. 18, 2002), that denial of overtime pay to a plaintiff, allegedly in retaliation for the time she spent in giving testimony before the municipal Police Department Pension Board, did not amount to an adverse employment action, because the "[p]laintiff's 'compensation, terms, conditions or privileges of employment' were not materially or seriously altered as a result of the denial. In fact, they were not changed at all." *Id.* at *5.

Again, in *Craven v. Texas Department of Criminal Justice*, 151 F. Supp. 2d 757, 763-69 (N.D. Tex. 2001), the Northern District of Texas held that denial of a white correctional officer's request to transfer from the third shift (10:00 p.m. until 6:00 a.m.) to the more desirable first shift (6:00 a.m. until 2:00 p.m.) was not an actionable adverse employment action under Title VII, because it did not involve *a reduction* in pay, benefits, or other "non-trivial" conditions of the plaintiff's employment — only a change in the hours of work. *See also Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 n.6 (10th Cir. 1998) (holding that, "[i]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer an adverse employment action"); *Joiner v. Ohio Department of Transportation*, 949 F. Supp. 562, 567 (S.D. Ohio 1996) (holding that the transfer of an African-American plaintiff from the position of "County Superintendent" to "Highway Maintenance

Superintendent" for the state department of transportation, resulting in the plaintiff's loss of the opportunity to earn overtime, did not amount to an actionable, "adverse" employment action). *Cf. Chan v. Wodnicki*, 123 F.3d 1005, 1009-10 (7th Cir. 1997) (holding in a § 1983 case that the transfer of a police officer — allegedly in retaliation for the police officer's invocation of the Fifth Amendment when testifying before a grand jury — to a position in which his "only concrete detriment was the loss of ... the opportunity to earn additional compensation through overtime assignments and the use of a government car" did not violate clearly established law).

This court finds the foregoing authority persuasive, and holds that defendant's denial of plaintiff's requests for assignment to the tobacco detail, investigation division, K-9 unit, and 1999 DUI Task Force did not rise to the level of actionably adverse employment actions. None of these positions implicated a material alteration in the terms, conditions, or privileges of plaintiff's employment, and instead amounted solely to "purely lateral" transfers insufficient to support a Title VII action.

That is not to say, however, that a plaintiff could not establish an adverse employment action based on an employer's repeated denials of even purely lateral transfers. The Eleventh Circuit declined in *Wideman v. Wal-Mart Stores, Inc.* to fix a finite standard by which adverse employment actions can be measured, opting instead to state merely that "there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable" under Title VII. *Wideman*, 141 F.3d at 1456. Even so, the legislative history and subsequent interpretation of Title VII make clear the impropriety of an unyielding, strict interpretation of the term "adverse employment action."

Congress intended Title VII to be "a complex legislative design directed at a historic evil of national proportions." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975). The statute was structured to "achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Id.* at 417, 95 S.Ct. at 2371 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)); *see also McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 358, 115 S.Ct. 879, 884, 130 L.Ed.2d 852 (1995) (stating that Congress designed Title VII's remedial provisions to "serve as a spur or catalyst to cause employers to self-examine and to self-evaluate their employment practices and to endeavor to eliminate ... the last vestiges of discrimination") (internal citations and quotations omitted); *Ellerth*, 524 U.S. at 763, 118 S.Ct. at 2257 ("Title VII is designed to encourage the creation of antiharassment policies and effective grievance mechanisms."); *Equal Employment Opportunity Commission v. Total Systems Services, Inc.*, 240 F.3d 899, 903 (11th Cir. 2001) (citing cases in which Supreme Court elucidated congressional intent behind Title VII). One of Title VII's ultimate objectives is to "make persons whole for injuries suffered on account of unlawful employment discrimination." *Moody*, 422 U.S. at 418, 95 S.Ct. at 2372.

Federal courts are instructed to exercise their discretionary equitable powers to achieve these goals, although those powers are not "unfettered by meaningful standards or shielded from thorough appellate review." *Id.* at 416, 95 S.Ct. at 2371. Congress, in fact, "took care to arm the courts with full equitable powers ... [f]or it is the historic purpose of equity to 'secur[e] complete justice.'" *Id.* at 418, 95 S.Ct. at 2372 (quoting *Brown v. Swann*, 10 Pet. 497, 503, 9 L.Ed. 508 (1836) (alteration in original).

31

Given the breadth of these equitable powers and the remedial nature of Title VII, this court can visualize circumstances in which a plaintiff might be due relief for repeated denials of even purely lateral transfers: namely, where the *number* and *character* of such repeated denials rises to the level of an adverse employment action.  The Eleventh Circuit's opinion in *Keenan v. American Cast Iron Pipe Co.*, 707 F.2d 1274 (11th Cir. 1983), tends to support this premise.

In *Keenan*, the appellate court considered an employee's challenge to an employer's garnishment policy, and the disciplinary reprimands issued to employees handed out under that policy.  The garnishment policy at issue provided "that employees who are garnished will be disciplined by receiving reprimands for the first and second garnishments and will be discharged for the third."  *Id.* at 1275.  The Eleventh Circuit reversed the district court's finding that the plaintiff had failed to prove his prima facie case of discrimination, because the district court had failed to consider whether *reprimands* under the garnishment policy could themselves rise to the level of an adverse employment action; the district court instead had examined solely how many employees had been *discharged* pursuant to the garnishment policy.  *Id.*  Considering the broad remedial purpose of Title VII, the *Keenan* Court observed that the "disciplinary nature of the reprimand may so affect the conditions of employment as to make the reprimands cognizable under Title VII," and held that "a reprimand that has a meaningful adverse effect on an employee's working conditions may be prohibited."  *Id.* at 1277.

The Ninth Circuit's opinion in *Fielder v. UAL Corp.*, 281 F.3d 973 (9th Cir. 2000), also tends to support the premise under consideration.  While decisions of courts outside this circuit admittedly are only persuasive, this court notes that the Eleventh Circuit's opinion in *Wideman* specifically relied on, and joined, the Ninth Circuit, among others, in holding that "Title VII's protection ...

32

extends to adverse actions which fall short of ultimate employment actions." *Wideman*, 141 F.3d at 1456 (relying on *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987)). Moreover, the Ninth Circuit opinion cited by the *Wideman* court held that "non-ultimate employment decisions [such] as '*[t]ransfers* of job duties ... if proven, would constitute adverse employment decisions cognizable under' Title VII ...." *Wideman*, 131 F.3d at 1456 (quoting *Yartzoff*, 809 F.2d at 1375) (emphasis added) (internal quotations omitted). Particularly persuasive is the *Fielder* Court's observation that, if Title VII "were to be interpreted in a strict manner, employers could retaliate at will so long as the retaliation does not constitute an ultimate employment decision or rise to the level of a constructive discharge." *Fielder*, 218 F.3d at 984.

Like the Ninth Circuit, this court can formulate scenarios in which an employer could repeatedly deny an employee's transfer requests (or force unwanted transfers) at will, so long as those actions implicated purely lateral transfers typically outside the purview of Title VII. *See Brown*, 199 F.3d at 457. Indeed, therein lies the wisdom of the Eleventh Circuit's reluctance to fix a hard and fast definition of the term "adverse employment action" in *Wideman*, 141 F.3d at 1456.

Ultimately, whether the denials of plaintiff's transfer requests rise to the level of an adverse employment action is a factual determination to be made by the district court. *See Keenan*, 707 F.2d at 1277. Despite the findings of the *Keenan* and *Fielder* Courts, this court concludes that defendant's denial of plaintiff's requests for transfer to the tobacco detail, investigation division, K-9 unit, and 1999 DUI Task Force did *not* rise to the level of actionably adverse employment actions, because those decisions neither materially altered the terms, conditions, or privileges of plaintiff's employment, nor prevented his promotion to a Grade 9 pay scale.

33

## 2.    Lack of a causal linkage

The final claim that must be addressed is the contention that plaintiff was subjected to disparate disciplinary sanctions on the basis of his race by the City's Chief of Police. That claim fails on the third component of the *Llampallas* formulation of a disparate treatment case: the causal linkage between the initiating official's alleged discriminatory animus and the adverse employment action complained of.

Discussion of the causation component has been neglected in the case law. That is in large part due to the fact that it is "an extraordinary case in which an employer admits its has taken an adverse employment action against a plaintiff employee 'because of' the employee's sex [or other protected characteristic]." *Llampallas*, 163 F.3d at 1246 (footnote omitted); *see also, e.g., Combs v. Plantation Patterns*, 106 F.3d 1519, 1537 (11th Cir. 1997) ("Frequently, acts of discrimination may be hidden or subtle; an employer who intentionally discriminates is unlikely to leave a written record of his illegal motive, and may not tell anyone about it."). As a consequence, courts often "must rely on inferences drawn from the observable facts to determine whether a Title VII violation has occurred." *Llampallas*, 163 F.3d at 1246. This inferential method of proving a causal linkage is most easily seen in the context of sexual harassment cases, in which the employee of the defendant who harassed the plaintiff, and the employee who inflicts a "tangible employment action," are one and the same.

> [T]he fact that the harasser was the decisionmaker for the tangible employment action gives rise to an inference that the harasser's discriminatory animus motivated that action. We assume that the harasser, because she harbors a discriminatory animus towards the plaintiff, could not act as an objective, non-discriminatory decisionmaker with respect to the plaintiff. Thus, *any time the harasser makes a tangible employment decision that adversely affects the plaintiff, an inference arises*

34

> *that there is a causal link between the harasser's discriminatory animus and the*
> *employment decision.* A Title VII plaintiff, therefore, may establish her entire case
> simply by showing that she was sexually harassed by a fellow employee, and that the
> harasser took a tangible employment action against her.

*Llampallas*, 163 F.3d at 1247 (emphasis supplied). Where the harasser and the official inflicting the

adverse employment action are *not* the same person, however, there is a break in the chain of

circumstances, and the plaintiff "cannot benefit from the inference of causation arising from the

common identity of a harasser and a decisionmaker." *Id.* at 1248.

When the allegedly biased employee who manifested a discriminatory animus toward the

plaintiff and the decisionmaker ultimately inflicting the employment action complained of are *not*

one and the same, plaintiffs sometimes attempt to supply the missing link in the causal chain through

use of the so-called "cat's paw theory."

> This theory provides that causation may be established if the plaintiff shows that the
> decisionmaker followed the biased recommendation without independently
> investigating the complaint against the employee. In such a case, the recommender
> is using the decisionmaker as a mere conduit, or "cat's paw" to give effect to the
> recommender's discriminatory animus.

*Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (citing *Llampallas*, 163 F.3d

at 1249). Once again, this theoretical concept is most easily grasped in the context of sexual

harassment cases.

> Several courts have held that when the harasser in a Title VII case is not the
> decisionmaker, if the plaintiff shows that the harasser employed the decisionmaker
> as her "cat's paw" — *i.e.*, the decisionmaker acted in accordance with the harasser's
> decision without herself evaluating the employee's situation, *see Shager v. Upjohn*
> *Co.*, 913 F.2d 398, 405 (7th Cir. 1990) — causation is established. *See, e.g., Long*
> *v. Eastfield College*, 88 F.3d 300, 307 (5th Cir. 1996) ("If ... [the decisionmaker] did
> not conduct his own independent investigation, and instead merely 'rubber stamped'
> the recommendations of [those who held a discriminatory animus], the causal link

35

between [the plaintiffs'] protected activities and their subsequent termination, would remain intact."). In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers. *See Shager*, 913 F.2d at 405 (stating that in such a situation "[t]he [decisionmaker] would no more be a nonconductor [for discriminatory animus] ... than would be the secretary who typed [the plaintiff's] discharge papers knowing nothing of the [] discrimination that lay behind the discharge"); *Burlington Indus.* [*v. Ellerth*], [524] U.S. [at 762], 118 S.Ct. at 2269. In effect, the harasser *is* the decisionmaker, and the titular "decisionmaker" is a mere conduit for the harasser's discriminatory animus.

*Llampallas*, 163 F.3d at 1249 (emphasis in original) (holding that the defendant's ultimate decisionmaker did not act as the harasser's "cat's paw," because he met with the plaintiff to investigate the situation leading to harasser's complaints).

The "cat's paw theory" has been employed in contexts other than sexual harassment cases. The plaintiff in *Stimpson*, for example, was a former city police officer who complained that she had been wrongfully terminated because of her sex. The Tuscaloosa Chief of Police recommended that the plaintiff be discharged and, following a hearing, the municipal Civil Service Board approved his recommendation. The Eleventh Circuit held that the causal linkage between any gender-based animus motivating the Chief's recommendation and the plaintiff's subsequent termination was "broken by the Board's hearing and independent decision to actually terminate her." *Stimpson*, 186 F.3d at 1331.

> We note at the outset that under Alabama law, the City has no power to terminate police officers such as Stimpson. Under Act No. 249 of the Alabama legislature, 1947 Ala. Acts 174, only the Civil Service Board has the power to do so. The Board has the discretion to terminate, give a lesser form of punishment to, or entirely vindicate a police officer brought before it. Consequently, the City's recommendation that the Board terminate Stimpson does not, itself, constitute a change in the terms or conditions of employment absent a sufficient causal link between the termination and the discriminatory animus behind the recommendation.

36

We have previously stated the general proposition that in some cases, a discharge recommendation by a party with no power to actually discharge the employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's discharge. *Zaklama v. Mt. Sinai Medical Center*, 842 F.2d 291, 294 (11th Cir. 1988). However, as we have recently explained, this causation must be truly direct. When the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit from the inference of causation that would arise from their common identity. Instead, the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee. *Llampallas*, 163 F.3d at 1248.

One way of proving that the discriminatory animus behind the recommendation caused the discharge is under the "cat's paw" theory.  . . .

In this case, Stimpson has not introduced any evidence that could reasonably indicate that the City's alleged discriminatory animus influenced the Board's decision to terminate her. Furthermore, she has not introduced any evidence to show that the Board acted as a "cat's paw" or rubber stamp for the City's recommendation. To the contrary, the evidence shows that the Board has the sole power and discretion to terminate police officers, that its members are appointed by the Governor of Alabama, that it conducted a three day hearing to investigate the charges, and that during the hearing Stimpson was represented by legal counsel and was allowed to put on defense evidence and witnesses. It is hard to imagine any other procedural device that would ensure a more fair and independent decision than that of the Civil Service Board. We need not announce a bright line at which an independent investigation becomes a rubber stamp to resolve this case, because the record before us does not contain any hint of a cat's paw arrangement. Consequently, we hold that Stimpson has failed to produce sufficient evidence to allow a reasonable jury to find causation between the City's alleged discriminatory animus and the Board's decision to terminate her. ...

*Stimpson*, 186 F.3d at 1331-32 (footnote omitted).

An analogous case, although one arising under a different corpus of civil rights law, is *Morro v. City of Birmingham*, 117 F.3d 508 (11th Cir. 1997). The claims in *Morro* were based upon 42 U.S.C. § 1983, and the central issue on appeal was whether "the City of Birmingham's Police Chief

37

is a final policymaker with respect to disciplinary suspension decisions in the City's police department." *Id.* at 510.[65] The *Morro* Court addressed a factual situation similar to that in *Stimpson*:

> [T]he Chief's disciplinary decisions regarding dismissal, demotion, or suspension are subject to review by the Jefferson County Personnel Board, with limited further review by the Circuit Court. In fact, the Personnel Board reviewed and reversed the Chief's decision in this case, which demonstrates that the Personnel Board is not merely a rubber stamp for the Chief.
>
> Based on the City's governing regulations and evidence of its actual practices, it seems that local law makes the Jefferson County Personnel Board, and not the police chief, the final policymaker with respect to police dismissals, demotions, or suspensions. ...

*Id.* at 514-15.[66]

The conclusion that may be drawn from *Stimpson* and *Morro* is this: when an administrative review process is meaningful, and not just a "rubber stamp" for the initiating official's disciplinary decision, a local government cannot be held liable under either Title VII or § 1983 because the initiating official is neither the final decisionmaker, nor the ultimate repository of city authority. Stated differently, a meaningful administrative review process severs the causal connection between an allegedly biased initiating official and the employment action complained of. Such a process occurred here.

---

[65] In *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), a plurality of the Supreme Court wrote that "appointing authorities" who have authority to initiate personnel decisions are not municipal policymakers if those decisions are subject to meaningful administrative review. *See* 485 U.S. at 129-30, 108 S.Ct. at 927-28 (plurality opinion). Since *Praprotnik*, the Eleventh Circuit has "consistently recognized and given effect to the principle that a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." *Morro v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997) (collecting cases).

[66] The findings quoted in text technically are *dicta*, because the City of Birmingham failed to preserve the *Monell* defense at the trial court level; even so, "[i]f the City had preserved that issue for trial in the district court, and thus for our review on appeal, we have little doubt that the City would be entitled to escape the judgment against it on that basis." *Morro*, 117 F.3d at 515.

Plaintiff exercised his right to appeal the Police Chief's disciplinary sanctions to the Civil Service Board of the City of Florence, an independent entity created by State statute. *See* Act No. 437, 1947 Ala. Acts 291; *see also* Act No. 1619, 1971 Ala. Acts 2778 (providing further right to appeal any decision of the Civil Service Board to state circuit court). The decision of the Board in this case was anything but a "rubber stamp" of the Chief's decision. In a lengthy decision, the Board explained that plaintiff was to be restored thirty-five hours of compensation, but that his probation was extended and his take-home car privileges were suspended indefinitely. In addition, the decision rebuked the Chief of Police for managerial deficiencies. This decision evidences that the Board conducted a truly "meaningful administrative review." Plaintiff's claim accordingly fails.

## IV. CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment is due to be granted. An appropriate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this ___16th___ day of May, 2002.

_____
United States District Judge